FILED
07/26/2018
Clerk of the
Appellate Courts

## IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
May 29, 2018 Session

## CORT DONDERO, ET UX. v. ACCURAY INCORPORATED, ET AL.

**Appeal from the Circuit Court for Hamilton County**
**No. 15C1366    Ward Jeffrey Hollingsworth, Judge**

_____

### No. E2017-01741-COA-R3-CV

_____

This case involves claims asserted by a cancer patient against his radiation oncologist, the hospital where he was treated, and the developer of the radiation therapy system used to treat the patient. The patient alleges that the defendants failed to disclose that the treatment posed a risk of radiation damage to surrounding tissue and organs and misrepresented the safety of the treatment, such that he would not have agreed to undergo the treatment if he had known of the risks. The patient's wife also asserted a claim for loss of consortium. All three defendants moved for summary judgment on numerous grounds. The trial court granted summary judgment to each of the defendants, and the patient and his wife appeal. We conclude that the plaintiffs' claims against all three defendants are barred by the statute of limitations. Accordingly, we vacate in part, affirm as modified, and remand for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Vacated in Part, Affirmed as Modified and Remanded**

BRANDON O. GIBSON, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and D. KELLY THOMAS, JR., J., joined.

W. Neil Thomas, III, Chattanooga, Tennessee, for the appellants, Cort Dondero and Helene Dondero.

Karl M. Braun, Zachary Louis Gureasko, and Carson Wayne King, Nashville, Tennessee, for the appellee, Accuray Incorporated.

Joshua A. Powers and Hanna L. Burnett, Chattanooga, Tennessee, for the appellee, Chattanooga-Hamilton County Hospital Authority d/b/a Erlanger Health System.

Laura Beth Rufolo, Keith Harding Grant, and Philip Aaron Wells, Chattanooga, Tennessee, for the appellee, Frank Kimsey.

## OPINION

### I. FACTS & PROCEDURAL HISTORY

Cort Dondero was the chief operating officer of a successful and expanding business when he was diagnosed with prostate cancer in the summer of 2012. Mr. Dondero was originally scheduled to have his prostate removed, but due to lingering concerns about the surgery and its lengthy recovery period, he canceled the surgery date and sought information about alternative treatments. His primary care doctor referred him to Dr. Frank Kimsey, a radiation oncologist at Erlanger Medical Center in Chattanooga, Tennessee. On August 3, 2012, Mr. Dondero and his wife attended a consultation appointment with Dr. Kimsey, where they learned about CyberKnife radiation treatment.

According to promotional material utilized by Erlanger, CyberKnife is "[t]he world's first and only robotic radiosurgery system," and it "seeks and destroys tumors virtually anywhere in the body, painlessly and *without* invasive surgery." Dr. Kimsey discussed the CyberKnife treatment with the Donderos and also gave them a pamphlet with more information about the treatment. According to the pamphlet, the CyberKnife treatment "delivers beams of high dose radiation to tumors with extreme accuracy." Among other benefits, the pamphlet stated:

> [T]he CyberKnife System's treatment accuracy is unrivaled. Its ability to treat tumors with pin-point accuracy is unmatched by other radiation therapy and radiosurgery systems. The CyberKnife System can essentially "paint" the tumor with radiation allowing it to precisely deliver treatment to the tumor alone, *sparing surrounding healthy tissue*.

(emphasis added). Specifically, the pamphlet explained, a physician would develop a treatment plan "to match the desired radiation dose to the identified tumor location *while limiting radiation exposure to the surrounding healthy tissue*." (emphasis added) The pamphlet stated that "[p]atients may experience some minimal side effects, but those often go away within the first week or two after treatment."

Mr. Dondero decided to proceed with CyberKnife radiation treatment and signed a "Radiation Oncology Consent for Treatment" form, which stated:

> I, the undersigned, hereby consent to and authorize Dr. <u>Frank Kimsey</u> and

2

other healthcare professionals who are directed by him/her to administer radiation therapy treatments to <u>Prostate-Cyberknife</u> (site), on <u>Dondero, Cort</u> (patient's name) and continue such treatments from time to time as he/she may deem advisable. The effect and nature of this treatment has been discussed and explained to me by the above physician with regards to benefits, risks, immediate and possible long-term side effects.

        Also he/she has stated that there is a remote possibility of the scattered radiation causing injury, and this scattering is often beyond his/her control.

        I have been informed that radiation is destructive to both malignant and normal tissue with late radiation damage always possible. The treatment planning is formulated to reduce this complication by rendering the maximum dose to the tumor and minimal dose to the surrounding tissue whenever possible.

    . . . .

    . . . I fully understand the planned treatments and their risk(s).

Mr. Dondero underwent five CyberKnife treatments, conducted by Dr. Kimsey, in October 2012. During one or two treatments, Mr. Dondero reported experiencing pain in his penis and a burning sensation in his lower abdomen.

Mr. Dondero had his first post-treatment appointment with Dr. Kimsey on November 26, 2012. His prostate-specific antigen ("PSA") level remained elevated, but Dr. Kimsey assured Mr. Dondero that it would continue to decrease over time. Mr. Dondero's PSA level did continually decrease over the next few months. By May 2013, Mr. Dondero's PSA level had decreased by about fifty percent, and Dr. Kimsey told Mr. Dondero that he would remain under observation through continued PSA tests.

On July 25, 2013, Mr. Dondero contacted his primary care physician about passing blood from his rectum. He was referred to a gastroenterologist. Mr. Dondero had his first visit with the gastroenterologist on August 19, 2013. Ten days later, Mr. Dondero had another meeting with Dr. Kimsey and informed him about passing blood from his rectum. According to Mr. Dondero, Dr. Kimsey did not seem concerned. On September 11, 2013, the gastroenterologist performed a colonoscopy and cauterized damage to Mr. Dondero's rectum. Mr. Dondero admittedly assumed that the damage was caused by the CyberKnife treatment.

On December 2, 2013, Mr. Dondero had another appointment with Dr. Kimsey. His PSA level had risen. Mr. Dondero reported having blood in his urine, problems with his urine flow, and pain in his penis and lower abdomen. He also complained about the damage to his intestines that was addressed by the gastroenterologist. According to Mr. Dondero, Dr. Kimsey told him that "this was a common problem associated with cyber

knife." Dr. Kimsey also told him that the pain in his penis was "common and transient."

Over the next few months, Mr. Dondero's PSA level continued to fluctuate. On May 20, 2014, Mr. Dondero told his primary care physician that Dr. Kimsey "appeared unconcerned with my erratic PSA" and that he wondered if he should seek a second opinion. Mr. Dondero's primary care physician referred him to a urologist. On June 2, 2014, Mr. Dondero had his first visit with the urologist. Days later, Mr. Dondero underwent a CT scan, but it could not be read due to scarring. Mr. Dondero was told that a panel of twenty doctors would review his case.

Around this time, Mr. Dondero was admittedly disappointed with Dr. Kimsey's care and canceled an upcoming appointment with Dr. Kimsey via the following email:

> Please let Dr. Kimsey know that I have [sic] in the process of determining how I should go forward since Cyber Knife is no longer an option and removing what is left of my prostate is not an option.

On September 8, 2014, Mr. Dondero had another meeting with the urologist and was informed that "[d]ue to having the Cyber knife treatments there are very few to no options that are not high risk." The urologist referred Mr. Dondero to another urologist, who specialized in the care of prostate cancer, for a second opinion. At least one week prior to his scheduled appointment, Mr. Dondero prepared a detailed timeline of the treatment he had received related to his prostate.

Mr. Dondero first met with the second urologist, for a second opinion, on September 17, 2014. Additional testing confirmed that Mr. Dondero still had prostate cancer. On April 8, 2015, Mr. Dondero underwent a radical salvage prostatectomy. On September 16, 2015, counsel for Mr. Dondero sent pre-suit notice to Dr. Kimsey and Erlanger, notifying them of a potential health care liability claim against them. On November 18, 2015, Mr. and Mrs. Dondero filed this lawsuit against Dr. Kimsey, Erlanger, and Accuray Incorporated (the developer of the CyberKnife system). The complaint did not specifically list or characterize the type of claims or causes of action being asserted. Notably, the complaint did not allege that the CyberKnife treatments were negligently conducted. Instead, it contained the following allegation:

> Plaintiffs allege that Defendants departed from the recognized standard of acceptable professional practices in Chattanooga, Tennessee, or a similar community, and failed to act with ordinary and reasonable care in accordance with such standard *while leading up to* Mr. Dondero's treatment with the CyberKnife system, *by failing to disclose that the treatment indeed posed a risk of radiation damage to tissue and organs adjacent to the adenocarcenomas,* and that had he or a reasonable person have known of

4

the risks, they would not have agreed to submit to it.

Plaintiffs additional[ly] allege the Defendants *departed from the standard of care by recklessly misrepresenting the safety of the treatment.*

WHEREFORE, Cort Dondero sues the defendants for $7,500,000.00

. . . .

(emphasis added).

The three defendants filed separate motions for summary judgment, each asserting several grounds for dismissal. Dr. Kimsey filed a motion for summary judgment based on two grounds. He argued that the Donderos' claims were time-barred by the one-year statute of limitations because Mr. Dondero knew or should have known of his alleged injury more than one year before he sent pre-suit notice of his claims. And secondly, he argued that the Donderos could not show by the requisite expert proof that he deviated from the standard of acceptable professional practice as it related to the issue of informed consent. Dr. Kimsey submitted his own affidavit, in which he stated that he was familiar with the recognized standard of acceptable professional practice required of a radiation oncologist in Hamilton County, Tennessee, and in his opinion, he acted with ordinary and reasonable care and met the standard of acceptable professional practice with regard to the medical care, treatment, and management he provided to Mr. Dondero. Specifically, Dr. Kimsey stated that he discussed possible treatment options with Mr. Dondero, along with the "pros and cons" of CyberKnife treatment, its published success rates and failure rates, the cure rates of CyberKnife treatment compared to other prostate cancer treatments, and potential short and long-term negative side effects from CyberKnife treatment.

In addition to his own affidavit, Dr. Kimsey also submitted a statement of undisputed material facts, a memorandum of law, excerpts from the deposition of Mr. Dondero, selected documents that were exhibits to Mr. Dondero's deposition, excerpts from the deposition of Mr. Dondero's expert witness, and excerpts from the deposition of another treating physician. Regarding the statute of limitations defense, Dr. Kimsey submitted Mr. Dondero's deposition testimony demonstrating his knowledge that his gastroenterologist had repaired colon damage that was "due to the CyberKnife" in September 2013 (two years before pre-suit notice was sent). As for the lack of expert proof, Dr. Kimsey pointed to the fact that Mr. Dondero's only expert witness regarding the standard of care was not a medical doctor, but a professor at a medical school in Georgia, who had never attended medical school himself or been licensed to practice medicine. The expert witness had a Ph.D. in medical sociology and was willing to offer an opinion "from an ethics perspective," but not a medical or clinical perspective. The expert witness had never been trained to operate CyberKnife equipment or seen it in person, and he did not know the risks of CyberKnife treatment.

Erlanger filed a motion for summary judgment and likewise argued that the Donderos' claims were barred by the one-year statute of limitations. Erlanger further argued that it had no duty to obtain informed consent due to the fact that it is an institutional defendant, and Erlanger incorporated by reference the arguments raised by Dr. Kimsey, including the assertion that the Donderos' expert witness was unqualified to render an opinion. Erlanger submitted numerous exhibits along with its motion, including discovery responses, deposition excerpts, and other documents.

Accuray also filed a motion for summary judgment based on the statute of limitations and further asserted that the claims against it were barred by the learned intermediary doctrine. Accuray relied on the affidavit of Dr. Kimsey and also submitted numerous deposition excerpts, discovery responses, and exhibits in support of its motion.

The Donderos filed a response to the motion for summary judgment filed by Dr. Kimsey, contending that their expert was competent to testify and qualified to render an opinion as to the issue of informed consent. The Donderos attached to their motion the curriculum vitae of their expert witness, but not any of his deposition testimony. Regarding the statute of limitations, the Donderos argued that the symptoms Mr. Dondero experienced in the years after his treatment did not put him on notice of an injury because Dr. Kimsey was dismissive of the symptoms and continued to characterize the treatment as a success. The Donderos responded to Accuray's statement of undisputed material facts but did not file a separate response to the motions for summary judgment filed by Erlanger and Accuray.

The trial court entered an order resolving all three motions for summary judgment on August 17, 2017. First, the court addressed the motion filed by Dr. Kimsey. The trial court rejected Dr. Kimsey's argument that the statute of limitations had run. The trial court acknowledged that Mr. Dondero had "many complaints and concerns" during 2012 and 2013 but found that Dr. Kimsey reassured him that everything was okay. The trial court found that Mr. Dondero did not learn that he could not undergo any more CyberKnife treatments until September 17, 2014, when he obtained the second opinion from the second urologist, and "[i]t was after that he learned that his only other option was to have surgery to remove the prostate." Because counsel for Mr. Dondero provided pre-suit notice on September 16, 2015, the trial court found that this action was taken within the statute of limitations.

Still, the trial court granted the motion for summary judgment filed by Dr. Kimsey on the alternative ground that the Donderos lacked the necessary expert proof regarding the standard of care. Considering the fact that their expert did not know the specific risks of CyberKnife treatment about which Dr. Kimsey should have warned Mr. Dondero, the trial court found that the expert did not have a sufficient basis for his opinion, it would not substantially assist the trier of fact, and his opinion lacked trustworthiness.

6

Next, addressing Erlanger, the trial court rejected its statute of limitations argument for the same reasons discussed above with regard to Dr. Kimsey's motion. However, the court granted Erlanger's motion for summary judgment based on the alternative ground that Erlanger, as a hospital, had no duty to obtain informed consent from Mr. Dondero for the CyberKnife treatment performed by Dr. Kimsey.

Finally, with regard to Accuray, the trial court noted that the allegation against it was "somewhat sparse" but seemed to be a products liability claim based on failure to warn.[1] Consistent with its earlier finding, the trial court concluded that Mr. Dondero knew by September 2014 that he could have no more CyberKnife treatments and "was on notice that he might have a claim against Accuray at that time." Because Mr. Dondero did not provide pre-suit notice to Accuray, like he did for Dr. Kimsey and Erlanger, the trial court measured the timeliness of the claim against Accuray by the date the complaint was filed, on November 18, 2015. As a result, the trial court concluded that the one-year statute of limitations had run and that the claim against Accuray was time-barred.

The Donderos timely filed a notice of appeal. Thereafter, they filed in the trial court a motion to enlarge the record, seeking to have the entire transcript of the deposition of their expert witness included in the appellate record. The trial court denied the motion, concluding that the deposition was not presented to the trial court in its entirety and that the court did not consider the entire deposition in its ruling.

## II. ISSUES PRESENTED

The Donderos raise the following issues on appeal, which we have slightly restated:

1. Whether the opinion of the Donderos' expert witness should not have been excluded on the issue of informed consent;
2. Whether summary judgment should have been denied on the issue of informed consent where misrepresentations were made by Dr. Kimsey and Erlanger, negating informed consent and constituting medical battery, for which no expert proof was necessary;
3. Whether Erlanger assumed a duty to inform Mr. Dondero of the risks involved with CyberKnife treatment; and
4. Whether a question of fact existed with regard to whether the statute of limitations

---

[1] The Donderos do not challenge the trial court's characterization of their claim on appeal.

7

barred the claim against Accuray.[2]

In his posture as appellee, Dr. Kimsey raises the following issues:

1. Whether the trial court correctly determined that the Donderos cannot establish the applicable standard of acceptable professional practice or that Dr. Kimsey deviated from that standard;
2. Whether the Donderos can assert a claim for battery for the first time on appeal;
3. Whether the trial court erred in holding that the claim against Dr. Kimsey was not barred by the applicable statute of limitations; and
4. Whether portions of the brief filed by Mr. and Mrs. Dondero citing to documents that do not appear in the record should be stricken.

Erlanger raises the following issues:

1. Whether the trial court was correct in holding that Erlanger had no duty to obtain informed consent from Mr. Dondero for the procedure performed by Dr. Kimsey;
2. Whether the trial court was correct in finding that the Donderos' expert proof was insufficient to establish a health care liability claim;
3. Whether the trial court erred in finding that the claim against Erlanger was not barred by the statute of limitations;
4. Whether the Donderos' claim for medical battery fails both procedurally and substantively;
5. Whether the Donderos' citations to materials outside the appellate record should be disregarded.

Accuray also raises the following issues:

1. Whether the trial court correctly found that the statute of limitations barred the claim against Accuray;
2. Whether the failure to warn claim should have alternatively been barred by the learned intermediary doctrine;

---

[2] In the reply briefs filed by the Donderos, they attempt to raise an additional issue regarding whether two of the defendants' motions for summary judgment should have been denied for failure to recite that there was no genuine issue of material fact. Issues cannot be raised for the first time in a reply brief. *See Owens v. Owens*, 241 S.W.3d 478, 499 (Tenn. Ct. App. 2007) ("A reply brief is a response to the arguments of the appellee. It is not a vehicle for raising new issues."). We note, however, that this argument lacked merit in any event. *See Anderson v. DTB Corp.*, No. 89-172-II, 1990 WL 33380, at *2 (Tenn. Ct. App. Mar. 28, 1990) ("A motion for summary judgment need not contain any particular incantation to comply with the rules as long as it states the basis for the motion and the relief being sought.")

3. Whether the misrepresentation claim against Accuray was insufficiently pled and unsupported by any evidence;
4. Whether the trial court correctly denied the motion to enlarge the record seeking to include information not before the trial court; and
5. Whether this Court is precluded from considering any portions of the brief filed by Mr. and Mrs. Dondero citing extraneous materials outside the record.

For the following reasons, we vacate in part, affirm the grant of summary judgment in favor of all three defendants, and remand for further proceedings.

## III. STANDARD OF REVIEW

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04. The party moving for summary judgment may satisfy its burden of production by (1) affirmatively negating an essential element of the nonmoving party's claim or (2) demonstrating that the nonmoving party's evidence at the summary judgment stage is insufficient to establish its claim. *Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235, 264 (Tenn. 2015). When a motion for summary judgment is properly supported, the nonmoving party, in order to survive summary judgment, may not rest upon the mere allegations or denials of its pleading but must respond, and by affidavits or one of the other means provided in Rule 56, set forth specific facts showing that there is a genuine issue for trial. *Id.* at 265. "The nonmoving party must demonstrate the existence of specific facts in the record which could lead a rational trier of fact to find in favor of the nonmoving party." *Id.* "Summary judgment should be granted if the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish a genuine issue of material fact for trial. *Id.* (citing Tenn. R. Civ. P. 56.04, 56.06). Appellate courts review the grant or denial of a motion for summary judgment de novo with no presumption of correctness. *Id.* at 250.

## IV. DISCUSSION

Because the statute of limitations was the only issue raised with regard to all three defendants in the trial court and on appeal, and it was outcome determinative as to Accuray, we begin with that issue.

Tennessee Code Annotated section 28-3-104 provides that actions based on injuries to the person shall be commenced within one year after the cause of action accrued. Tenn. Code Ann. § 28-3-104(a)(1)(A). "'The concept of accrual relates to the date on which the applicable statute of limitations begins to run.'" *Story v. Bunstine*, 538 S.W.3d 455, 463 (Tenn. 2017) (quoting *Redwing v. Catholic Bishop for Diocese of*

*Memphis*, 363 S.W.3d 436, 457 (Tenn. 2012)). "[A] cause of action accrues and the statute of limitations commences to run when the patient discovers, or in the exercise of reasonable care and diligence for his own health and welfare, should have discovered the resulting injury." *Teeters v. Currey*, 518 S.W.2d 512, 517 (Tenn. 1974). "The application of this so-called 'discovery rule' results in personal injury actions being filed more than one year after the injury occurs in instances in which [the] plaintiff does not discover and reasonably could not be expected to discover that an injury was sustained during the year." *Wyatt v. A-Best, Co.*, 910 S.W.2d 851, 854 (Tenn. 1995) (citing *Potts v. Celotex Corp.*, 796 S.W.2d 678, 680 (Tenn. 1990)).

However, the discovery rule is not intended to allow the plaintiff to delay filing suit until he discovers all the facts affecting the merits of the claim. *Redwing*, 363 S.W.3d at 459. "[T]he discovery rule does not delay the accrual of a cause of action and the commencement of the statute of limitations until the plaintiff knows the full extent of the damages[.]"[3] *Id.* (citing *B & B Enters. of Wilson Cnty., LLC v. City of Lebanon*, 318 S.W.3d 839, 849 (Tenn. 2010); *Weber v. Moses*, 938 S.W.2d 387, 393 (Tenn. 1996)). "The statute of limitations is tolled only during the period when the plaintiff had no knowledge at all that the wrong had occurred and, as a reasonable person, was not put on inquiry." *Wyatt*, 910 S.W.2d at 854 (internal quotation omitted). "[O]nce the plaintiff has information sufficient to alert a reasonable person of the need to investigate the injury," the statute of limitations begins to run. *Woodruff by & through Cockrell v. Walker*, 542 S.W.3d 486, 495 (Tenn. Ct. App. 2017) (citing *Sherrill v. Souder*, 325 S.W.3d 584, 593 n.7 (Tenn. 2010)).

Whether a plaintiff exercised reasonable care and diligence in discovering an injury or wrong is usually a question of fact. *Sherrill*, 325 S.W.3d at 596. However, summary judgment is appropriate "if the facts in the record and all reasonable inferences demonstrate" that the cause of action accrued on or prior to the determinative date. *Id.* at 597.

Returning to the facts in the present case, the Donderos alleged the following in

---

[3] This principle is illustrated by *Beaman v. Schwartz*, 738 S.W.2d 632, 633 (Tenn. Ct. App. 1986), in which a patient slept in contact lenses, awoke with eye pain, and was told by her optometrist the next day that she had suffered a corneal abrasion. A week later, she was hospitalized with a suspected eye infection, which was confirmed by a lab report. *Id.* The patient filed suit against the manufacturer of the contact lens, alleging failure to properly warn. *Id.* The patient insisted that she was suing based on the eye infection, not the corneal abrasion, and therefore, her cause of action did not accrue until the date of her hospitalization. *Id.* at 634. The Court of Appeals disagreed, focusing instead on when the patient knew she had an eye injury. *Id.* "In Tennessee," the court explained, "an injured party is not allowed to wait to bring an action until he knows all of the injurious effects as consequences of an actionable wrong." *Id.*

10

their complaint:

> Due to the CyberKnife radiation damage to tissue adjacent to the carcenomas, Mr. Dondero has extensive scar tissue to his prostate, and caused it to adhere to Mr. Dondero's bladder and intestine. As a proximate result of the radiation damage to Mr. Dondero's bladder, resulting from its proximity to his prostate, the removal of his cancerous prostate rendered him incontinent, such that he must change diapers 7 times daily, is unable to work or engage in normal physical activities, and is unable to have intimate relations with his wife, Helene.
>
> Plaintiffs allege that Defendants departed from the recognized standard of acceptable professional practices in Chattanooga, Tennessee, or a similar community, and failed to act with ordinary and reasonable care in accordance with such standard *while leading up to* Mr. Dondero's treatment with the CyberKnife system, *by failing to disclose that the treatment indeed posed a risk of radiation damage to tissue and organs adjacent to the adenocarcenomas*, and that had he or a reasonable person have known of the risks, they would not have agreed to submit to it.
>
> Plaintiffs additional[ly] allege the Defendants *departed from the standard of care by recklessly misrepresenting the safety of the treatment.*

(emphasis added). When asked for more specificity during discovery, Mr. Dondero asserted that Dr. Kimsey should have informed him that CyberKnife was unable to selectively target only cancerous tumors, unable to treat tumors with pinpoint accuracy, and unable to spare surrounding healthy tissue, but instead, he provided Mr. Dondero with literature claiming that CyberKnife selectively targeted cancerous tumors with pinpoint accuracy and spared surrounding healthy tissue.

All of Mr. Dondero's CyberKnife treatments were completed in October 2012. For the reasons discussed in detail below, we agree with the defendants' assertion that the Donderos' causes of action accrued, at the very latest, by September 8, 2014. Counsel for Mr. Dondero sent pre-suit notice to Dr. Kimsey and Erlanger on September 16, 2015,[4]

---

[4] "When a plaintiff gives pre-suit notice to a health care provider under Tennessee Code Annotated section 29-26-121, the one-year statute of limitations is extended by 120 days." *Runions v. Jackson-Madison Cty. Gen. Hosp. Dist.*, No. W2016-00901-SC-R11-CV, --- S.W.3d ---, 2018 WL 2710948, at *6 (Tenn. June 6, 2018) (citing Tenn. Code Ann. § 29-26-121(c)). However, the pre-suit notice must have been sent "within the statutes of limitations . . . applicable to the provider[.]" *Shaw v. Gross*, No. W2017-00441-COA-R3-CV, 2018 WL 801536, at *3 (Tenn. Ct. App. Feb. 9, 2018) (quoting Tenn. Code Ann. § 29-26-121(a)(3)). If the statute of limitations has already expired, the notice is not timely and does not serve to extend the statute of limitations. *Id.*

and the Donderos filed their complaint against Accuray on November 18, 2015. Accordingly, we conclude that all of the claims were time-barred, and the defendants were entitled to summary judgment on that basis.

Even though Mr. Dondero had been informed that the CyberKnife treatments would be pain-free, he experienced pain in his penis and lower abdomen during two of the treatments. Mr. Dondero's PSA level steadily decreased in the months immediately after his treatment, but he began passing blood from his rectum in July 2013.[5] Mr. Dondero contacted his primary care physician and was referred to a gastroenterologist. In addition, Mr. Dondero reported the issue to Dr. Kimsey during an appointment, but Dr. Kimsey appeared unconcerned.

On September 11, 2013, the gastroenterologist performed a colonoscopy and cauterized damage to Mr. Dondero's rectum. When Mr. Dondero prepared his timeline of events on or before September 8, 2014, in preparation for obtaining a second opinion from a second urologist, he described this September 11, 2013 procedure with the gastroenterologist as follows: "Colon damage was repaired *due to cyber knife*." (emphasis added). During his deposition, Mr. Dondero was asked about the September 11, 2013 procedure and his description of it on the timeline he prepared:

> Q.  But let's move on to September 11th, 2013. Do you see that entry --
> A.  Yes.
> Q.  --the second entry from the bottom?
> A.  (Whereupon, witness moved head up and down.)
> Q.  It says: "Colon damage was repaired due to CyberKnife."
> A.  Uh-huh.
> Q.  Is that a yes? I'm sorry.
> A.  Yes.
> Q.  So, at that point, Dr. Hetzel [the gastroenterologist] told you or you learned somehow that he was repairing colon damage that was due to the CyberKnife. Right? I mean, you put it on your history. Right?
> A.  Yeah. Yes.
> Q.  So, at that point, you had to be suspecting that the CyberKnife risks had not been adequately disclosed. Right? If, all of a sudden, now you were having surrounding tissue repaired, isn't that one of your main things, that the CyberKnife was pin -- operated with pinpoint

---

[5] During his deposition, Mr. Dondero explained that he was actually experiencing blood in his urine and also in his stool. He also described a particularly alarming incident in which he was walking down the street and suddenly passed "a significant amount of blood" to the point that "my underwear and everything was just covered in blood, which scared me."

accuracy; so, if you're having colon damage repaired due to the CyberKnife, weren't you at least suspecting at that point that the CyberKnife risks had not been adequately disclosed, like you've testified to today?

A.   At that point in time, Dr. Hetzel said it was – he was able to fix it, and I just kind of walked out as it was no big deal at that time.

Q.   Right. But, I mean, you wrote in the history –

A.   Uh-huh.

Q.   -- before you went to see [the second urologist] that colo[n] damage was repaired due to the CyberKnife.

A.   Yes.

Q.   On September 11, 2013. Right?

A.   Well, it was.

. . . .

Q.   Look at Paragraph 10 in your complaint. "Due to the CyberKnife radiation damage to the tissue adjacent to the carcinomas, Mr. Dondero has extensive scar tissue in his prostate, causing it to adhere to Mr. Dondero's bladder and intestine." Do you see that?

A.   Yes.

Q.   And my point simply is that you realized that you had adherence to your intestine on September 11 of 2013, when Dr. Hetzel had to repair your colon, as you put, in your own words, due to the CyberKnife. Right?

   That's the only question I'm asking you. I'm not asking you if it's your pivotal moment or not. I'm just asking you a simple question about you realized it because you were having surgery about it. Right?

A.   Yes.

Mr. Dondero admittedly believed that the damage addressed by the gastroenterologist was caused by the CyberKnife treatment. Mr. Dondero was also experiencing intimacy issues by this time.

Months after the damage was repaired, Mr. Dondero had another appointment with Dr. Kimsey in December 2013. According to the timeline prepared by Mr. Dondero, during this appointment:

I complained about the pain in the tip of my penis *and the damage to my intestines. I was told this was a common problem associated with cyber knife.*

(emphasis added). Mr. Dondero also reported blood in his urine, problems with his urine

flow, and pain in his lower abdomen.

Mr. Dondero's PSA level fluctuated over the next few months. In May 2014, Mr. Dondero told his primary care physician that Dr. Kimsey appeared unconcerned about his "erratic" PSA level and that he wondered if he should seek a second opinion. The primary care physician referred Mr. Dondero to a urologist, who performed a CT scan, but it could not be read "[d]ue to scarring." Admittedly disappointed with Dr. Kimsey's care, Mr. Dondero sent an email cancelling his next appointment with Dr. Kimsey and informing Dr. Kimsey that he was "in the process of determining how I should go forward since Cyber Knife is no longer an option and removing what is left of my prostate is not an option."

On September 8, 2014, Mr. Dondero had another meeting with the urologist. According to the timeline he prepared, he was informed that "[d]ue to having the Cyber knife treatments there are very few to no options that are not high risk." The urologist referred him to a second urologist for a second opinion. The appointment with the second urologist was scheduled for September 17, 2014, but Mr. Dondero prepared his timeline on or before September 8, 2014, in preparation for the appointment.

The defendants have proffered uncontroverted evidence that Mr. Dondero knew in 2013 that he had surrounding tissue damage to his rectum, colon, and/or intestines and that it was due to the CyberKnife radiation treatment. This damage required repair by a gastroenterologist. When Mr. Dondero complained to Dr. Kimsey about the damage to his intestines, he was told that "this was a common problem associated with cyber knife." Thereafter, Mr. Dondero continued to experience pain, blood in his urine, and other urinary issues, and his urologist was unable to read his CT scan due to scarring. This information was sufficient to have placed a reasonable person on notice of the injury and that it was the result of the defendants' allegedly wrongful conduct.

The trial court concluded that the statute of limitations did not bar Mr. Dondero's claims against Dr. Kimsey and Erlanger, citing two reasons. First, the trial court noted that while Mr. Dondero had "many complaints and concerns" during 2012 and 2013, "Dr. Kimsey reassured him that everything was OK." Before the trial court, the Donderos had argued that the symptoms and complications experienced by Mr. Dondero after his CyberKnife treatment did not put him on notice of an injury because Dr. Kimsey "was dismissive of the symptoms and characterized them as temporary distractions" after an otherwise successful treatment. However, this argument is misplaced considering the nature of the allegations against Dr. Kimsey in this lawsuit. The Donderos' allegations were not about the ultimate success or failure of the CyberKnife treatment. They alleged that the defendants *failed to inform* Mr. Dondero about the possibility of radiation damage to surrounding tissue and organs. If the defendants "fail[ed] to disclose that the treatment indeed posed a risk of radiation damage to tissue and organs adjacent to the

14

adenocardenomas" and misrepresented its safety, as the complaint alleges, then Mr. Dondero should have realized that when he became aware of damage to his intestines in 2013 and admittedly attributed it to the CyberKnife treatment. *See Sampson v. Schneider*, 886 S.W.2d 764, 764-65 (Tenn. Ct. App. 1994) (explaining that a cause of action for lack of informed consent "accrued upon the occurrence of complications, the possibility of which the defendant had not explained to [the patient]"); *Housh v. Morris*, 818 S.W.2d 39, 42 (Tenn. Ct. App. 1991) (concluding that when the plaintiff experienced unanticipated complications, she "certainly knew or discovered that she had a cause of action based on lack of informed consent because she had not been told that these risks may occur"). This was the type of injury about which the defendants allegedly failed to warn Mr. Dondero. Respectfully, under these circumstances, it does not matter if Dr. Kimsey assured him that "everything was OK."

Secondly, the trial court found:

It was not until September 17, 2014[,] that [the second urologist] told [Mr. Dondero] there could be no more Cyberknife treatments. That was the first time Mr. Dondero says he realized that there could be no more radiation treatment. It was after that he learned that his only other option was to have surgery to remove the prostate. The pre-suit notice was sent to Dr. Kimsey on September 16, 2015, which is within the statute of limitations.

However, the record reflects that Mr. Dondero knew before September 17 that he could not have additional CyberKnife treatments and that his options were limited as a result. In his June 17, 2014 email, Mr. Dondero wrote:

Please let Dr. Kimsey know that I have [sic] in the process of determining how I should go forward since Cyber Knife is no longer an option and removing what is left of my prostate is not an option.

On September 8, 2014, Mr. Dondero had a meeting with the first urologist. According to the timeline he prepared, he was informed that "[d]ue to having the Cyber knife treatments there are very few to no options that are not high risk." It was not necessary for Mr. Dondero to obtain a second opinion from a second urologist to confirm this information in order for him to have notice of it.

On appeal, Mr. Dondero suggests that the statute of limitations did not begin to run until 2015 because it was not until then that a biopsy confirmed the continued presence of prostate cancer, he had his prostate removed, and months after surgery, he "learned of the extent of damage caused by the radiation" and that it extended to his

15

bladder.[6]  However, as noted above, "the discovery rule does not delay the accrual of a cause of action and the commencement of the statute of limitations until the plaintiff knows the full extent of the damages[.]" *Redwing*, 363 S.W.3d at 459.  "[T]he plaintiff cannot delay filing suit 'until all injurious effects or consequences of the actionable wrong are fully known.'" *Id.* (quoting *Weber*, 938 S.W.2d at 393).  *See, e.g., Sampson*, 886 S.W.2d at 764-65 (concluding that a medical malpractice claim based on failure to warn accrued when the patient had unanticipated complications after breast surgery, including bleeding, swelling, and sloughing of skin, not when she was later advised that her nipple was lost and that she may need reconstructive surgery).

We affirm the trial court's finding that the statute of limitations barred the Donderos' claim against Accuray.  We further conclude that the statute of limitations also barred the Donderos' claims against Dr. Kimsey and Erlanger, whether based on lack of informed consent, medical battery, or loss of consortium, and we vacate the trial court's findings to the contrary.  Although the trial court did not grant summary judgment to Dr. Kimsey and Erlanger on this basis, we may affirm the grant of summary judgment if the trial court reached the correct result for the wrong reason.  *See Torres v. Bridgestone/Firestone N. Am. Tire, LLC.*, 498 S.W.3d 565, 577 (Tenn. Ct. App. 2016) (citing *Arnold v. City of Chattanooga*, 19 S.W.3d 779, 789 (Tenn. Ct. App. 1999)).  In light of this ruling, all other issues are pretermitted, including those regarding the alternative grounds for summary judgment and the post-judgment dispute over the deposition of the Donderos' expert witness.

## V. CONCLUSION

For the aforementioned reasons, the decision of the circuit court is hereby vacated in part, affirmed as modified, and remanded for further proceedings.  Costs of this appeal are taxed to the appellants, Cort Dondero and Helene Dondero, for which execution may issue if necessary.

_____
BRANDON O. GIBSON, JUDGE

---

[6] Specifically, Mr. Dondero argues that "he did not know that there had been radiation damage and scarring where the bladder sphincter meets the urethra" until October 21, 2015, "and this was the first time I learned of the extent of damage caused by the radiation."  However, by that time, counsel for Mr. Dondero had already sent pre-suit notice of the health care liability claim, as the notice was sent on September 16, 2015.